EGBERT B. WHITLEY, plaintiff in error, *vs.* THE STATE OF GEORGIA, defendant in error.

1. Before refusing to continue a criminal case, the Judge should inquire what diligence has been used by the accused, when he learned that the witness would testify to a material fact, what opportunity he had had for preparation, when the transaction occurred, etc., and if the showing appears to be *bona fide* made, time should be given.
2. When negroes were, as *tales* jurors, put upon the prisoner, and he challenged the array, and, by consent, the negroes were put off the jury, and the prisoner made no further objection to the panel, his challenge to the array was waived.
3. Dying declarations of opinions, not facts, are inadmissible as evidence.
4. When the charge of the Court assumes certain things as facts, and is in such shape as to intimate to the jury what the Judge believes the evidence to be, and that they made defendant guilty, a new trial will be granted.

Murder. Motion for new trial. Tried before Judge HUTCHINS. Walton Superior Court. February Term, 1868.

The defendant moved the Court to continue said case, in writing, as follows : That, by reason of the recent occurrence of the fact, to-wit: on the 27th of January, 1868, and the prevalence of popular excitement against him in the county, he believes he cannot go safely to trial at this term of the Court; that in the rencontre in question, deponent received two severe pistol-shot wounds, one through the testicle and left thigh, the other through the body, from the effects of which he has not sufficiently recovered to enable him to endure the fatigue and excitement of the trial ; that having

been, since the occurrence referred to, all the while closely confined in jail, under guard, and not allowed to communicate with his friends, and suffering great bodily pain from said wounds, he has had no opportunity properly to prepare his defence, the want of which opportunity is more specially apparent in this, viz: on the day of the occurrence there was a large crowd in town; there are many witnesses to the facts, amongst whom defendant has, as yet, been informed of the name of only one, besides his son Tom, by whom he could prove that, at the moment the difficulty began, he, deponent, snatched the pistol used in the rencontre from his said son: this was —— Stephens, who has, unfortunately, died since the fact occurred; but deponent believes he can produce others, by the next term of the Court, if opportunity is allowed him to do so, by whom he can prove the same fact." This motion was strengthened by the testimony of Dr. N. L. Gallaway, who had been attending physician of prisoner, who testified as to the wounds defendant received, their serious character, not necessarily mortal, but necessarily very painful, especially the one through the testicle; that whilst witness could not say that defendant might not stand his trial without serious injury, he thought there might arise serious consequences, and if the defendant were under the control of witness, as physician, he would not think it proper or prudent for the defendant to stand his trial in his then present condition; he could not say that he would suffer from the trial; wounds all were healed except a small place in his back, and he was in good health.    The Court overruled the motion for a continuance.

The Court proceeded to empannel a jury.    The first panel having been exhausted, the State put the second panel of *tales jurors* upon the defendant, who challenged the array because eight of the talesmen were negroes, and not free white citizens, of said county, and not, by the laws of said State, competent to serve as jurors, to try said case.    These colored jurors were, by both parties, subsequently excused, but not till the Court had overruled the objection, and put the array upon the prisoner.

On selecting the jury, seventy or eighty jurors, on their *voir dire*, disqualified themselves for cause, on account of bias and prejudice, and of relationship to prisoner. The jury having been empanneled, the State proceeded to the introduction of testimony, a brief of which appears hereafter, and offered in evidence, the sayings of Wommack, the deceased, made a short time previous to his death, to-wit: " That it was hard to be killed for telling the truth ; that God knew he told the truth, and Eg. knew it was the truth," as dying declarations. Defendant objected, on the ground that the sayings were irrelevant, and not admissible as dying declarations, though made *in extremis.* The Court overruled the objection, and admitted the testimony.

The evidence was as follows :

### FOR THE STATE.

Dr. W. S. R. HARDEMAN : I was crossing street from Court-house ; Sheats was in front of me ; some one in front of me ; believe it was 17th January, County-Court day, 1868, Walton county; while crossing, saw Wommack opposite Roberts's store, walking fast; when he got to Roberts's store, son of E. B. Whitley was standing there on stoop; when deceased passed, young Whitley said something to Wommack, didn't hear what it was ; Wommack checked his gait, made some reply, think he said "you can't do it;" can't remember, certainly; Wommack passed along slowly, sorter sideways; prisoner came from towards Fletcher's; when approached, asked his son " what the damn rascal wanted;" didn't hear any reply; prisoner said he could give the "damn rascal what he wanted," I think that is what prisoner said; prisoner continued to approach, and Wommack going along sideways, but watching prisoner; (on the side-walk, this was;) Wommack called to prisoner not to approach on him; prisoner continued to approach, and Wommack going on; about that time Wommack drew a pistol, and, I think, had it out, he reached out; about that time looked, and Whitley drew his pistol, and Wommack fired; couldn't say positively where prisoner drew pistol from, but think he had both hands in his coat pockets,

and think prisoner drew his pistol out of his pocket; young Whitley was on Roberts's stoop, a few paces from the firing; firing commenced when prisoner was a few yards; Whitley kept straight on, made no pause; Whitley asked his son what the d—d rascal wanted; Whitley received nothing from his son that I saw; commencing firing, Wommack first, Whitley returned the fire, and Wommack again; Whitley tried to fire again, and pistol failed; Whitley fired soon as he drew the pistol; think pistol was in left hand, not certain; Whitley and Wommack drew his pistols before either fired; I had a tree between me and Whitley, and halted until Wommack ran off; Mr. Wommack ran off around the square; saw him fall, full length, on his face; examined him; I considered him a dead man; he asked me if I could do any thing for him; I told him that I hoped he would not die, I would examine him; I did examine him, and told him he could not live; (he said that it was hard to be killed for telling the truth, and God knew it was the truth, and that Eg. knew that he (Wommack) told the truth; deceased was wounded in right breast, above the nipple, between the third and fourth rib, with a pistol ball, small one; probed, but couldn't tell how deep it was; ball didn't come out; died in two hours; died from effects of the wound, by hemorrhage from the wound; knows nothing but what Wommack said about the cause of the difficulty; died in Walton county; am practising physician.

### *Cross-examined.*

Mr. Whitley received two shots; did not examine them by probe: one about the false rib, left side, the other touched the scrotum; did not examine because he would not suffer me to probe them; Mr. Wommack drew his pistol and fired first; I thought he could have fired twice; two first fires almost simultaneously; Wommack then fired again; think pistols were repeaters; I was looking at both at the time; and was in and out of court-house several times during the day.

*Re-cross-examined.*

Saw nothing pass between Whitley and his son. If young Whitney did give his father anything, I did not see it. The two fires mentioned, one was by Wommack and one by Whitley.

Wm. C. Smith: Difficulty was on the 27th of January, 1868, in Walton county, on County-Court day. Dad was about to start home; up at Mr. Bullock's store, I saw Mr. Wommack coming in a fast trot from the court-house steps, and Wommack went into Mr. Bullock's store and I followed him; Mr. Whitley was on the steps, but wasn't following Wommack; I met Mr. Wommack coming to the door; Wommack went there to get some money from Bullock for his fees; I heard Mr. Whitley coming in the store, didn't see him; Whitley asked where the damn rascal was that swore a damn lie against him, and that he intended to have revenge; Wommack was in far end of room; don't know whether Whitley was in the house or on the steps; I didn't see him; Mr. Wommack jumped out of the back door; last I seed of him he was running around by the well; next time I met Wommack about Smith's store and I give him the money Bullock gave me for him; I went back to Bullock's and Mr. Whitley was there; he talked a good deal; don't remember all he said; said he had paid out $30, and he had $30 more to pay out, when I told him to keep quiet; he was walking about; spoke to his son Tom; son Tom had his pistol; he told him to give it to him, (Whitley,) and his son sorter refused to do it at the start; son was handling the pistol; he asked him for it again and the son gave it to him, (Whitley,) and Whitley put it in his right hand breeches pocket, I think; I went out doors and Whitley staid in the store: after awhile he came out and I told him not to go where Wommack was, that Wommack was prepared for him, and Wommack had said he would kill him, and he was going to die before he run any more; Whitley 'lowed if Wommack could kill him, Whitley, before he could kill Wommack, he

had friends that could bury him ; Whitley called to his son to come on; he was going towards Wommack ; I followed Whitley down and told him he had better not go, that Wommack was prepared and would kill him; followed a good piece, but I stopped ; when he (Whitley) put the pistol in his pocket, I went out of the store and left him in there with his sons ; don't know who had the pistol when they came out of the store ; when they got pretty close, Wommack drew his pistol; Whitley said something I didn't hear ; Wommack told him (Whitley) to stand back and not to come any further ; Wommack backed with his pistol drawed, three or four steps, may be further, may be not so far ; Whitley was going forward toward Wommack ; presently got to firing; Mr. Wommack had his pistol cocked and up ; Wommack fired first, and Whitley fired then ; could not see Whitley's pistol until he drew it, and Whitley fired as soon as he drew his pistol ; Whitley had his pistol out before Wommack fired ; I think that there was five shots fired; Wommack fired twice; couldn't tell who 'twas fired all the time, it so mixed up ; Wommack and Whitley's first shots were very near together, Wommack firing first ; Jim Whitley was behind him ; didn't see Tom ; didn't see Whitley stop, but I was looking back a good deal, talking to the crowd ; I didn't see Whitley make any halt ; they were about ten steps between them when they commenced firing ; didn't see any one else taking part ; his sons were following ; Whitley said the man ; he, Whitley, didn't say who it was ; said good deal ; if Whitley mentioned his (Wommack's) name, I have forgotten it.

### Cross-examined.

Mr. Wommack shot twice; didn't examine Mr. Whitley.

CALVIN L. SMITH: Saw deceased go over steps towards Bullock's store, briskly ; went into B.'s store; Whitley came up, and said he was going to whip that rascal that swore a lie against him. (This was soon after deceased passed.) Asked witness if he had anything against him ; said no ; then went towards Bullock's, and went into piazza; said he was best

man in town; saw deceased go out back door, and went round back buildings, running; do not remember seeing any one go into the house but Wommack; Whitley was tight; saw W. after shooting; had blood on his shirt; this was in the evening; County-Court in session; did not see W. have a pistol.

EZEKIEL PATRICK: Was bailiff, attending County-Court; deceased was a witness against Whitley, in a prosecution against Whitley in that case; was at court-house steps; saw Whitley walking down side-walk, fast; Wommack was walking in front of him, and rather turned and walked sideways; told Whitley not to rush on him; Whitley still towards; Wammack fired first, I think; (both had pistols drawn when I first saw them;) it was nearly simultaneously, hardly the crack of your fingers; Wommack was giving back in a stooping position, with a pistol in his hand, saying don't rush on me, several times; Whitley had his pistol drawn too; I think there were five shots fired; I think Whitley shot twice; Wommack fired three times; Whitley's snapped once; both were six or eight-inch barrel repeaters; never heard Whitley saying anything before; I had just gone out; they told me Whitley had to pay $30 00, and cost of suit.

### Cross-examined.

Had just walked out; discovered Mr. Whitley first, and a little before him was Mr. Wommack; firing commenced soon after, when they got close together; Whitley was shot twice; didn't examine the wounds; only saw his clothes where the ball had entered; two witnesses, I think Wammack and his brother-in-law; prosecution in the County-Court; Mr. Sorrell's too; I don't remember about Mr. Burson. I believe he was examined that day; Madison Smith, also. They were from ten to fifteen feet apart when they fired.

### Rebuttal.

Don't know when he died; he was about dead when I left, late in the evening.

JOSEPH P. HALLIS: Saw Mr. Whitley come up after Wommack, from towards Bullock's; Wommack had been there for a minute; Wommack told him not to push on him, not to advance on him; understood Whitley to say that Wammack had begged enough; not certain; Wommack drew his pistol, and Mr. Whitley drew his; they were about ten or twelve paces apart; Whitley kept advancing towards Wammack; stepped about six paces, when the firing commenced; couldn't tell who fired first; couldn't tell any difference in the reports, so near together; Wommack was shot in the right breast; died about six o'clock that evening; he was shot in the afternoon; I saw Whitley's son standing on the step of Roberts's store; if there was anything said or done when Whitley passed his son, I didn't see it; Whitley didn't stop; he was walking slowly; didn't see Tom give his father any pistol; he might have slipped it to him without my seeing him do it.

## Cross-examined.

Been on the steps about two or three minutes; first I saw of Wommack came from behind Bullock's store, running; next time, I saw him coming up in front of Roberts's store, and then Whitley's son said something to him, and he stopped; never saw him go above Roberts's when he came back; I was sitting on the steps; saw some excitement over at Roberts's, and I stopped there; don't say Whitley didn't get a pistol from his son; he passed between his son and me; four shots fired; I can't tell who fired first or last; little difference; if anything, Mr. Wommack fired first, if there was any difference; Mr. Wommack fired first after that; I think Tom Whitley spoke first, talking low; I saw Wommack as far down as Lunsford's store, moving up towards Roberts's store; that is, in the same direction as Bullock.

## Rebuttal.

Wommack kept going backwards; seemed to be trying to get behind Davis when Whitley was going towards him.

Whitley *vs.* The State of Georgia.

JOHN W. DAVIS: I never heard Whitley make any threats, more than to ask where was the rascal that had swore the lie on him, that he could whip him; said it right there at the court-house steps, a few minues after the trial; called no name; didn't know who he was referring to at the time; he didn't say at the time; I don't really know, I 'lowed 'twas Wommack; if any one had swore the lie, it must have been Wommack; he mentioned no names; never heard him make any threats about Wommack, or have any pistol previous to the trial.

### Cross-examined.

I think Whitley was drinking; don't know for certain; saw the shooting; Wommack fired first; very little difference between the second shots, they were so near together; couldn't tell, all mixed up; couldn't tell any distinction; I think there was three shots; two were a double shot; they came after Wommack's first shot; saw Tom Whitley, and I heard Wommack and him talking; could not hear what they said; saw no arms; Wommack I first saw come out of Lanier's front door, walking backwards and forwards, twice, I think; saw Whitley coming down the street; Lanier's is about forty yards below Roberts's store.

### Rebuttal.

I am cousin of Whitley's wife; the part of town where they were was the business portion of the town.

### Sur-rebuttal.

Saw in Whitley's clothing where he was shot; don't know whether prisoner is right-handed or not; never noticed him using his left hand.

L. ETCHISON: Whitley never said anything to me about his pistol on Christmas day; saw Whitley with a navy pistol; he made no threats against Wommack; never heard him say anything about the prosecution.

W. BULLARD: First of Christmas days, 1867, Whitley got a five shooting pistol from me that belonged to E. T. Hill; Whitley wanted to buy it from me about Christmas times; said that he would try it, and if it suited him, he would buy it; said nothing about a prosecution; only said he wanted to buy it.

EDWARD T. HILL: Did deposit a pistol with Bullard: same pistol that was used in the shooting by Whitley; don't know where the pistol is now; I gave it up to the officers; I got it from Mr. Herrin.

BENAGER S. SHEATS: The first I saw, I was at the trial, and walked out, and as I got to the door-step I looked in the direction of Mr. Bullard's store; saw Whitley and his son go in; didn't see Wommack until he came in from behind the brick houses—Lunsford's corner; this was about as quick as a man could run around them; I went to Lunsford's, and Whitley came out of Bullard's and walked down, and Wommack was some where near Eli Smith's door; as Whitley approached, Wommack rather gave back, and, after awhile, said, stand back, Mr. Whitley; and when he had backed between the two doors, Wommack drew his pistol; Whitley said then, damn you, something, and very soon drew his pistol; me and Lunsford being in range, we stepped inside of the store; didn't see the shooting; the reports were nearly same time; Whitley had just got his pistol out, don't think he had raised it; the reports were nearly same, one a little before the other; Wommack, as he gave back, would say, stand back; Wommack lived an hour or more.

### Cross-examined.

First time saw Wommack he was coming around Lunsford's corner; he came up to Smith's store and walked backwards and forwards; two first shots almost simultaneously; wasn't much difference between any of them; next one very soon after.

WARREN McGAUGHEY: All I heard Whitley say was

at Bullard's store; Wommack was in there by me; Whitley came to the door and asked where was the damn rascal that swore a lie agaist him, and said he would have revenge or die; saw no pistol; when Whitley came, Wommack jumped out of the back door and run off; it is five feet from the ground; no steps to it; I understood Whitley to allude to Wommack in the remark he made.

### FOR THE DEFENDANT.

Dr. N. L. Gallaway: Whitley was wounded in two places; one left side, just below false ribs, and lodged directly back under the skin; the other entered upper third of right testicle, made its exit through middle third of the left, then entered just behind the middle of the thigh, ranging downwards (ran just above the knee) and lodged; no place of exit; both wounds considered serious, but not necessarily mortal; think wound mentioned penetrated the hollow; saw no track where it passed; didn't probe it; extracted ball six or eight days after; between two-thirds and a half pint of puss and blood; ball was extracted from the back; am prisoner's physician; saw Whitley that evening; was very nervous and nauseated; gave medicine to see if his bowels were wounded; had active operation; waited on him once a day for six or eight days; seen him through the window every day since; testicles were swollen considerable for four or five days; testicles and scrotum doubled by swelling.

### *Cross-examined.*

Action of medicine evidenced that bowels not wounded; matter necessarily must ensue by the ball remaining in the wound; this means his nuts were cut.

Thomas Whitley: I was at Bullock's store with father, to settle an account between him and Bullock about the costs that had accrued that day; pistol got in his father's boot, and I took the pistol out of the boot; father took it, and laid it on the counter, and I took it up, and went out in the piazza, and dropped it in my pocket; he then asked me for it, and

I refused; afterwards gave it to him; we walked on down the street towards Mr. Fletcher's store, and I took the pistol, and went down to Roberts's store; went on the stoop, and about that time, Mr. Wommack came up the street; he had a pistol in his right breeches pocket, with his hand on it; he walked up and down the street, I think twice, and me and Wommack had a few words, and father asked what Wommack wanted, and said, I have been begged all day not to have any fuss with him; I told him that I didn't want to, nor didn't intend to have any but that he (Wommack,) had been jawing with me all day; I had the pistol when I went down there; father saw Mr. Wommack's pistol, and took the pistol, with his right-hand, out of my pocket; I saw Wommack's pistol drawn then; when we went to Bullock's, nobody was in the party with us; I had gone down from the court-house; soon after, Wommack came down, and passed over the street, and then father soon after that; father was drinking, was the reason I took the pistol from him.

*Cross-examined.*

Father had pistol when we went to Bullock's; don't know where he got it; I had never had the pistol that day, until we went to Bullock's store; I gave the pistol to father at Bullock's; while I was at Roberts's store, and when father asked me what Wommack wanted, father took the pistol out of my pocket; Wommack was just below him; between Nunnally's and Roberts's, about Smith's door; I am his son; came to town with father and brother; that was the only pistol in the crowd; me and another brother were here that day.

MADISON SMITH: I got a pistol from Mr. Wommack after Court adjourned; I kept it an hour or so; I met Wommack in the evening, on the street, right at Lanier's grocery, and when we got to the grocery, I gave him the pistol; Wommack turned and came up in the direction of Bullock's store; this was a few minutes before the firing commenced.

### *Cross-examined.*

Wommack met me below Lanier's store, and he was going down the street; said he wanted his pistol; nothing more.

B. L. LANIER: Whitley bought two or· three bottles of liquor from me that day: he kept his liquor there, and came several times during the day; I thought he was under the influence of liquor; didn't know exactly how many times he came there.

L. A. ROBERTS: I was in the back room of my store when the difficulty took place; I saw Mr. Whitley's son, the youngest of the two, the one in Court, on the stoop; he had been there but a few seconds until Mr. Wommack passed; in the passing was conversation between them; young Whitley said in the conversation that Wommack was a better man than he was, but I am as well fixed as you are; about this time his father walked up; asked Wommack what he had to do with him, (his son) you damn —; and they, (Whitley and his son) walked off together in direction of Wommack; in a few seconds the firing commenced; didn't see the firing; was in the back room of the store; store is forty or fifty feet long; did not see Wommack pass but once; he was going towards Smith's store, down the street; when Whitley came down, he didn't halt in front of my store; I didn't see him stop; I don't think, as well as I can recollect, that he stopped; door four or five feet wide; son was standing on the stoop when his father passed; would have seen him, he thinks, if he had stopped.

### *Rebuttal for State.*

JAMES S. BULLOCH: Heard the testimony of young Whitley; had no account with me to settle; there was some of the costs unpaid, and Whitley had agreed to deliver a bale of cotton; this arrangement was made on the court-house steps, before he went to my store; he was to bring the bale of cotton the next, or the day after; Whitley owed me no other account; if there was any pistol put on the counter, I

didn't see it; they were in the fire room most of the time; I was behind the counter, in the front room, most of the time; don't think there was any one in the fire room except Whitley, his sons, and Jim Melton; there are no counters in the fire-room; there are some desks; I was in the store room all the time they were there.

### *Cross-examined.*

I don't think he did put the pistol on the counter, I didn't see it, if he did; Whitley had the pistol in his hand when he went out of the store; think he was drinking that day; am special bailiff of County-Court; I do collect costs, but don't think its my duty to do so.

B. S. SHEATS: I was expecting the difficulty, and saw Whitley's son standing at Roberts's door, (the youngest of the two;) Whitley was above the store, coming in that direction; and I don't recollect that he halted; I kept my eye on him until he drew his pistol; I rather think I would have seen him if he had got a pistol from any one; I didn't see him get any pistol.

### *Cross-examined.*

I think his son moved a little; didn't move as near to Wammack as his father; he was behind his father.

WARREN MCGAUGHEY: Saw Whitley pass his son at Roberts's; was noticing Whitley, as he passed; if he halted I didn't see him; I didn't see him get any pistol from his son; didn't see him receive anything from his son; had my eye on him.

### *Cross-examined.*

I was right up in front of Bullock's store; had one foot on the steps and one on the side-walk; there was one man between Mr. Whitley and me; there was nothing that obstructed my view; I could see them; it was about fifty or sixty yards; was one man between me and Whitley; wasn't

right between us; he was a little on the edge of the side-walk.

The Court having read the Code and explained the different grades of homicide, made the following charges: "To constitute self-defence, it must appear that the person killing was placed in a situation where it was necessary for his own preservation, that is, that he had no reasonable means of escape; that he was obstructed, or the assault or the attack on him was so fierce as not to admit of his escape. If he attempt to escape from it, but is unable to do so, and kills · his assailant to preserve himself, or if the attack be such as to admit of no delay, and he destroys his assailant, in either case, he is justifiable, and guilty of no offence. Under this principle, and the principle laid down in the Code, which has been read to you, you will, in this case, carefully examine the facts as developed by the evidence, and see if the defendant has brought himself within the law of self-defence, and if so, he is guilty of no offence. But if you should be satisfied, from the evidence, beyond a reasonable doubt, that the defendant deliberately determined to assail the deceased with the purpose of taking his life, or doing him some grievous bodily injury, and the deceased knew this fact, and that in his rencounter with defendant, he was acting in self-defence, it is no difference, whether he fired the first shot or not, as he had, in that instance, a perfect right to destroy assailant to preserve himself, and if he only acted to that extent, he was guilty of no offence.

"If he failed, in his defence, to destroy his assailant, and his resistance was overcome, and the defendant succeeded in carrying out his original purpose, and killed the deceased, then it is murder, notwithstanding the deceased had prepared a weapon, and had endeavored to destroy his assailant to save himself. The law is careful of human life, and allows all men to protect themselves; they need not wait until the assailant has inflicted the fatal blow; he need not wait till the resistance is impossible; but whenever the circumstances are such as to excite the fears of a reasonable man that his

person is in danger, he may use all the means that God and nature have provided for his defence and preservation. But in this he must not go beyond what is necessary for his defence; if he does, then his acts become revenge, and not defence, and he is guilty of crime.

"If your minds are satisfied, beyond a reasonable doubt, that defendant was armed with a deadly weapon, and was pursuing the deceased with threats of vengeance, and the deceased knew those facts, he had the right to arm himself and destroy the assailant, and preserve himself, and his attempt to do so, and failing, is no justification for the defendant. If the two were willing to fight, if they mutually armed themselves for the combat, and met, and fought on equal terms, both doing so wilfully and determinately, with the intention of taking the life of the other, the slayer would be guilty of murder. But if they had a sudden quarrel, and on the spur of the moment, in the heat of passion, without premeditation drew weapons and fought, and one killed the other, it would be voluntary manslaughter, because there was no deliberation or malice prepense. Again, when two persons fall out and fight, and one of them declines the contest, get outs out of it, and the other pursues him, and makes a fresh attack on him, and he turns and kills his assailant, he is justifiable, having, in good faith, declined the contest, and endeavored to save himself. Again, when one forms a desire to get another engaged in a fight, and brings it on after drawing the other into it, kills him, in pursuance of a design formed for that purpose, the attack or resistance of the other is no defence, and the slayer would be guilty of murder, because of the previously formed design and intention to take his life."

The Court charged the jury upon the subject of reasonable doubts, and upon positive and negative evidence.

Defendant's counsel requested the Court to charge the jury—

*First.* That if the jury believe, from the evidence, that the deceased fired the first shot, and that in doing so he manifestly endeavored, by violence or surprise, to commit either murder

or manslaughter upon the person of Whitley, that Whitley would be justified in taking his life, to prevent him from doing so; and that, in order to determine what degree of force Whitley was authorized to use, the jury should inquire what was the degree of criminality which the law fixed upon the act of Wommack, under all the circumstances, in drawing his weapon and firing, in the manner and at the time they may believe, from the evidence, he is shown to have done, and if the jury believe that the prisoner killed the deceased to prevent deceased from inflicting upon him a serious injury, less than a felony, which the deceased was at the time manifestly endeavoring to inflict, the offence would be manslaughter, and not murder.

*Second.* That if the jury believe, from the evidence, that, had the deceased killed the prisoner in the rencounter, the circumstances were such as to have justified him in doing so, still, if the prisoner killed the deceased to prevent the deceased from killing him, and really acted on that motive, and not in a spirit of revenge, his offence is manslaughter, and not murder.

The Court charged, as requested, qualifying the first request by saying to the jury, after reading the request, " that is true, as a general principle of law;" and qualifying the second request by saying, " to that I have added, unless he brought about the necessity of killing the deceased himself," without explaining further.

The jury returned a verdict of guilty; whereupon counsel for defendant moved for a new trial, on the following grounds:

*First.* Because the Court erred in overruling the motion for continuance.

*Second.* Because the Court erred in overruling the challenge to the array of the second panel of *tales* jurors tendered in the trial, and in putting the panel upon the prisoner.

*Third.* Because the Court erred in admitting the sayings of the deceased as dying declarations.

*Fourth.* Because the Court erred in the charge to the jury.

*Fifth.* Because the verdict of the jury is contrary to law and the evidence.

*Sixth.* Because the Court erred especially in that part of the charge which relates to the law of self-defence, and to the legal effect of the question whether deceased drew his weapon and fired first, by charging, in substance, that if the deceased, under the facts of the case, was justified in doing so, but the prisoner succeeded in killing him, even though done to prevent himself from being killed, it was no justification, and he would be guilty of murder.

*Seventh.* Because that portion of the charge, given on request of prisoner's counsel, is inconsistent with the rest of the charge.

*Eighth.* Because the Court erred in qualifying, as he did, the request of prisoner's counsel; said qualification being calculated to lead the jury to believe that the Court did not regard the principle contained in the request as applicable to the case.

*Ninth.* Because the Court erred in qualifying, as he did, the second request, without explaining further that this necessity must have been brought about, not by threats or opprobrious words alone, but by some overt act, in furtherance of such threats, in order to preclude the prisoner from all right to have defended himself.

The motion was overruled by the Court, and counsel for defendant excepted.

The defendant was sentenced to be hung. Whereupon writ of error was sued out, assigning as error the refusal of the new trial on each of said grounds.

GEO. HILLYER, WALKER & McDANIEL, W. W. McLESTER, for plaintiff in error.

S. P. THURMOND, Solicitor General, (by brief,) for the State.

HARRIS, J.

There are many assignments of error made by the bill of exceptions, but we propose to confine our opinion to those only which we deem most material.    The first is the refusal of the Court to *continue* the case.    By paragraph 4553 of the Revised Code, it is evident that the policy of the law is that of a speedy trial, and hence the direction that a criminal case shall be tried at the term of the Court at which the *indictment is found.*    This rule was not intended to be inflexible ; it is a general direction, subject to such modification as the principles of justice demand ; thus, the absence of a material witness is a sufficient ground to change it.    It may so happen that the witness has not been subpenæd, and the question might arise, whether, in such an event, the trial could be postponed.

Instead of denying a continuance, the circumstances should control the decision.    What diligence was used ?    When was it discovered that such persons would prove a material fact for accused ?    What have been the accused's opportunities for making *preparation* for trial ?    How long since the transaction occurred ?    and other similar matters which may be presented.    These are all to be considered by the Court in the light of the administration of justice, and when the delay sought appears to be sought in good faith, with the view to a fair trial, time should be accorded, and especially where full opportunity for preparation has not been had.    Expense may accrue to the county by a continuance permitted to an accused person, who happens to be insolvent, but such a consideration must not be regarded for a moment when the paramount principle of giving a fair trial demands the postponement. The State can never be supposed to have any wish but for a fair trial.    Her honor and her justice should not be compromitted by her officers pressing forward hastily the trial of an accused person, when, from the circumstances, it is apparent that he will be cut off from the probable means of vindication.    That the spirit of our laws is opposed to a harsh and

Whitley *vs.* the State of Georgia.

rigorous interpretation, is evinced by a subsequent clause in the paragraph cited; that clause provides not only for a con-. tinuance from the term at which the indictment was found to the next succeeding term, but expressly confers the power on the Court to allow continuances, from term to term, *as often* as the principles of justice may require, on sufficient cause shewn on oath.

These general views, as to continuances, contain within them the principles by which we have been controlled in our decision upon the first assignment.

On the 27th January, 1868, in a rencounter with Wommack, who was killed by him, Whitley, the plaintiff in error, received two pistol-shot wounds, one through the body, the other through the thigh and testicles.   He was at once arrested, and kept closely confined in jail—guarded and denied intercourse with his friends.   On the 19th February, 1868, twenty-three days after the homicide, he was arraigned, and required to announce whether he was ready for trial. He said he was not, and moved the Court to continue the case for the purpose of preparing his defence.   He made an affidavit, and stated therein, whilst in jail, he had not been able to make inquiries for persons who had seen the difficulty, there having been many in town that day; that from the wounds he had received, he had not sufficiently recovered to enable him to endure the fatigue and excitement of a trial, having suffered great bodily pain, etc.   The affidavit of Dr. Galloway, the attending surgeon of Whitley, was also submitted.   The surgeon testified that he would not say that the accused might not stand his trial without serious injury; but he thought that serious consequences might arise, and that he did not think it prudent that Whitley should go to trial in his present bodily condition, though the wounds had nearly healed.   The motion for a continuance was overruled.   We think, if there ever was a case in which such a motion should have been promptly granted, this was the case.   This refusal entitles the plaintiff in error to a new trial.

2. The second assignment of error is, that the Judge over-

ruled the challenge of the accused to the array of the *second* panel, for that *eight* of the panel of jurors were negroes, who were not, by the law of Georgia, competent to serve as jurors. The Judge, in overruling the challenge, stated he was acting, in doing so, *only* in obedience to military orders. By agreement between the Solicitor-General and counsel for the accused, *the negroes were excused from service,* the Judge assenting. · The panel thus relieved from the objectionable persons summoned by the sheriff as jurors, was proceeded withwithout other objection. The assent to go on with the remaining persons, can be regarded only as a waiver to the challenge to the array, and this ground should not, therefore, have been included in the bill of exceptions. We, therefore, refrain from the expression of *any opinion* as to the sufficiency of a military order of a department commander, under what are called "the Reconstruction Acts," to make persons competent to sit as jurors, *who are not competent by the laws of the* State.

3. The third assignment is as to the admission of the following words as the *dying declarations* of Wommack, "that it was hard to be killed for telling the truth; that God knew that he (Wommack) told the truth, and Eg. knew it was the truth." The objection was, that they disclosed no *fact* as to the relations of the parties to the rencounter, or connected with it. We apprehend, there is a decisive test to which "dying declarations" must be subjected, and by it their admissibility as testimony can be readily determined. That test is, *whatever* may be stated by a witness under oath, is admissible in evidence as dying declarations, made by one under the conciousness of approaching death. The statement, under such circumstances, is held to be as truthful as if under oath, and equivalent to a statement *sworn* to. But the *opinions* of witnesses under oath, as a general rule, are inadmissible in evidence in *criminal cases,* and hence opinions in *dying declarations* are excluded. In the case of Sellers, cited in Roscoe · Criminal Evidence, pp. 27, 28, it was ruled that the dying declarations of *opinions* and *inferences,* without facts, could not not be given in evidence, and that, like witnesses, the

declarations must be confined to circumstances which caused the death, or facts having a distinct relation to it.   We are, therefore of the opinion that the Judge erred in not rejecting the sayings of Wommack as incompetent testimony.

4. Error has also been assigned upon portions of the charge given to the jury, viz : " that the charge is upon a hypothetcal statement of facts, not warranted by the testimony, which testimony involved the guilt of the prisoner, and that they excluded, in almost every instance, from the consideration of the jury, every hypothesis of the defendant's innocence or justification, and every hypothesis that might reduce the offence from murder to manslaughter."   The portions objected to are in the following words : " If you shall be satisfied, from the evidence, beyond a reasonable doubt, that the defendant deliberately determined to assail the deceased with the purpose of taking his life or doing him some grievous bodily injury, and the deceased knew the fact, and that in his rencounter with defendant,  he was acting in self-defence, it is no difference whether he fired the first shot or not as he had in that instance a perfect right to destroy his assailant to preserve himself, and if his resistance was overcome and the defendant succeeded in carrying out his original purpose and killed the deceased, then it would be murder, notwithstanding deceased had prepared a weapon and endeavored to destroy his assailant to save himself."

Again : " If your minds are satisfied, beyond a reasonable doubt, that defendant was armed with a deadly weapon, and was pursuing deceased with threats of vengeance, and that deceased knew these facts, he had a right to arm himself and destroy the assailant and preserve himself, and his attempt to do so, and failing, is no justification for defendant."

We think these portions of the charges liable to the exceptions taken to them.  *They assume, as in testimony, every thing that is essential to fix the guilt of the accused as a murderer,* and everything which could excuse the deceased, and *make his conduct throughout as entirely justifiable ;* the legal conclusions are applied by the Judge to such *assumed* facts. The jurors' minds were thus made to look through the testi-

mony for such facts as would produce a verdict of guilty, without, in any wise, instructing them to look to those portions of the testimony, which, when analyzed and carefully considered, might induce a *rational* doubt whether Whitley had formed any deliberate intention to take Wommack's life. The threats of vengeance used by Whitley were *indefinite.* The jury should have been instructed to draw their inferences as to what they meant, by weighing the words and circumstances under which they were uttered, and in connexion with his conduct *then* and *afterwards.* That Wommack was *pursued* by Whitley, with a deadly purpose, is also *assumed.* The testimony does not show clearly, and without reasonable doubt, *any pursuit* at all. The rencounter may have been an accidental casualty of two hostile parties brought together without the occurrence being sought; and this is a view, which, if the testimony will authorize such a conclusion, would have been an important consideration in ascertaining the degree of guilt of the respective parties.

It was also *assumed* that Whitley was the *assailant,* and the law arising upon such a fact was strongly stated. The testimony shews no *assault at any time* on Wommack. When Whitley approached Wommack on the sidewalk, where the rencounter took place, he was bid by Wommack not to advance; Whitley continuing to walk forward, Wommack drew his pistol, cocked it, and fired first; Whitley, when advancing, having no weapon in hand, making no threat, nor making any assault whatever. If, then, Whitley did not make any assault, then it became an inquiry, which the jury should have made, and to which the charge should have directed their attention, whether or not the parties, having hostile feelings towards each other, had not, without agreement or premeditation, been brought suddenly together, and, their passions inflamed thereby, engaged in mutual combat; and if they should regard the rencounter as casual, the parties being on equal terms, notwithstanding their previous differences, the law, in its tenderness to those who act under sudden violence of passion, would not have reduced the offence to manslaughter. There are other assumptions of fact, as in testimony,

Whitley *vs* the State of Georgia.

which might be pointed out, but as they are of minor importance we omit to notice them.

In every form in which the facts assumed by the Judge to be in testimony have been grouped together, with the intention of shewing what legal principles they involved, it strikes us that they were so presented as to admit of the jury reaching but two conclusions, viz: the guilt of murder in Whitley, and the entire justification of Wommack, when it is very questionable whether either would be a fair result from a full consideration of the *whole* testimony. The oftener we read the charge of the Judge, as contained in the bill of exceptions, the more deeply are we impressed with the conviction that it is violative of the spirit, if not the letter, of our Code, section 3183. By that paragraph, a Judge is not only prohibited from the expression of an opinion as to *what facts* have been proved, or as to the *guilt* of the accused, but he is also prohibited from an *intimation* of opinion as to either the one or the other. Had we been in the jury box, and addressed as it was by the Judge, it would have been impossible for us to have understood him otherwise than as conveying the idea that what he had stated were facts sworn to in the testimony, and that if we believed them to be true, then that Whitley was guilty of murder. The charge was, it appears to us, an intimation, or indirect suggestion, conveying to the mind, covertly but effectually, that the facts of the case were as he had stated them, and that they necessarily made defendant guilty; nor did the addition, that if the jury were satisfied of their truth, beyond a reasonable doubt, lessen or remove the effect of the impression made on their minds, that he believed the facts.

A charge from such a source, from a Judge commanding the confidence of all who know him, for the high attributes of integrity, ability and personal worth, could but have carried along with it to the jury, the impression it makes on us. If it had been intended, (which we will, by no means, impute,) to produce a verdict of guilty, we apprehend a more effectual mode, to assure such an end, could not have been pursued; indeed, it well merits the appellation of "a hanging charge."

In England, such a mode of charging would probably be unexceptionable; for the Judges there are accustomed "to sum up," or in other words, to comment temperately upon the testimony; state what appears to be proved, and what not proved; the value of particular facts, as also of them combined, and the result they should produce. This course, and it is *authorized* there, has necessarily, a weight with the jury, proportionate to the dignity, learning, impartiality and honest intentions of the magistrate, and is almost always decisive in giving direction to the verdict.

However valuable the assistance thus given to juries in England, in enabling them to perform intelligently their duties, such a course is *wholly unwarranted* by the laws of Georgia to its Judges.

By a jealousy, which has no foundation for its existence in a republican government, our Judges have been prohibited from the discharge of those duties which would seem most appropriately to belong to them in criminal trials, and have been made little else than mere *automata*, or why have juries been made alone the judges, not simply of the facts, but of the law governing them? Why otherwise, are the Judges prohibited from directly or indirectly expressing or intimating any opinion as to what facts are proved, or what facts in the case establish guilt?

Our experience on the circuit bench, makes us very sensible of the difficulty of making charges unexceptionable and free from violations of the Code, but we are persuaded it can be done by the Judge avoiding the slightest reference to the testimony, hypothetically or otherwise, and confining the instructions given to a statement of *what facts* are essential to bring a case within the crime alleged or involved in the indictment.

He should not be betrayed, by his zeal for the efficient administration of the criminal justice of the State, to throw directly or indirectly the influence and weight of his opinions into the scale. The Act intended, after he had *charged the law*, that he should no further have any connexion with the case; his duty then ceased.

Whitley *vs.* the State of Georgia.

We must all obey its clear and unmistakable requirements, and whatever fears we may entertain as to the effect of this restriction upon the Judges in charging the juries, the consequences, whatever they may be, cannot be ascribed to those who obey law ; they will, if they should prove injurious, probably satisfy the people that they are not imputable, in any degree, to *the ministers* of the law, but to the *law* itself. The verdict in this case is the fruit of a charge which involves a violation of law ; and if this had been the only ground of error alleged, the plaintiff in error would, on it, have been entitled to a new trial.

Judgment reversed.