## JOHN MULKEY v. STATE.

No. A-141.    Opinion Filed February 6, 1911.

(113 Pac. 532.)

1.  WITNESSES—Examination—Leading Questions. An objection to a question that is obviously leading and suggestive should be, for this reason, sustained.

2.  HOMICIDE—Dying Declarations—Right of Accused to be Confronted with Witnesses. The constitutional provision (Bill of Rights, sec. 20) that the accused "be confronted with the witnesses against him" refers to living witnesses, and not to dying declarations.

3.  HOMICIDE—Evidence—Dying Declarations—Scope. Dying declarations must be restricted to facts concerning the cause and circumstances immediately attending the homicide, and forming

76          5 OKLAHOMA CRIMINAL REPORTS.

a part of the res gestae, and must relate to facts, and not to mere conclusions or matters of opinion or belief.

4.    HOMICIDE—Self-Defense—Admissibility of Evidence—Pistol-Carrying Habit of Deceased. In a prosecution for homicide, where the defense is justifiable homicide in self-defense, and there is evidence tending to establish such defense, it is competent for the defendant. upon being examined as a witness in his own behalf, to testify that the deceased was in the habit of carrying a pistol.

5.    SAME—Former Violent Acts of Deceased. In a homicide case, where the defense is justifiable homicide in self-defense, evidence was offered on behalf of the defendant to prove particular instances of violence and quarrelsome conduct on the part of the deceased, these acts of violence and misconduct being known to the defendant.

      Held competent for the purpose of showing the disposition of the deceased to become violent without provocation, and, as tending to show his condition of mind, and violent temper on such occasions, and his disposition to use deadly weapons.

6.    SAME. The knowledge of the defendant, derived from personal observation, of the deceased's propensity to attack persons without cause. is an important circumstance in determining from the standpoint of the defendant the reasonableness of the danger apprehended by him, and from which the defendant might estimate the conduct of the deceased, the character of the attack made upon him, and what he might expect from his assailant, as well as that which he might at the moment deem necessary to guard himself against.

7.    TRIAL—Argument of Prosecuting Attorney. A prosecuting attorney must confine his argument to a fair discussion of the issues in the case and the legitimate argument on the part of the defendant, and, where a prosecuting attorney in his closing argument to the jury went outside of the record and appealed to the passions and prejudices of the jury, the strength of the testimony against the defendant will be considerd, and, if the improper argument may have determined the verdict, a new trial will be granted.

8.    HOMICIDE—Justifiable Homicide—Resisting Assault in One's Home. Where one, without fault himself, at his own home, is attacked by another, in such a manner or under such circumstances as to furnish reasonable grounds for apprehending a design to take away his life or to do him some great bodily harm, and there is reasonable ground for believing the danger imminent, and that such design will be accomplished, and the person assaulted has reasonable ground to believe. and does believe such danger is imminent, he may act upon such appearances, and, without retreating, kill his assailant.

9.    HOMICIDE—Self-Defense—Question for Jury. Whether the ap-

pearances were sufficient to convince a reasonable man that death or greater bodily harm was intended is a question for the jury.

10. **SAME—Apparent Danger.** In judging of the danger, the circumstances must be viewed as they appeared to the defendant when he shot the deceased, and though the danger was not real. but merely apparent, the homicide would be justifiable if at the time the conduct of the deceased was such, under the circumstances, as to reasonably induce the defendant to believe that the deceased was about to kill or do him some great bodily harm.

11. **HOMICIDE—Justifiable Homicide.** A homicide committed in self-defense, or in defense of habitation, against one who manifestly intends or endeavors by violence or surprise to commit a felony on either, is justifiable homicide.

12. **HOMICIDE—Instructions—Applicability to Case.** It is error in a court in a homicide case to give to the jury instructions which are not relevant to the evidence and which may mislead the jury to the prejudice of the defendant.

(Syllabus by the Court.)

*Appeal from District Court, Carter County; Stilwell H. Russell, Judge.*

John Mulkey was convicted of manslaughter, and he appeals. Reversed and remanded.

John Mulkey was indicted for the murder of Dennis Lawson, alleged to have been committed on the 4th day of December, 1908. On the 21st day of December, the defendant was placed upon trial, and on the 23d day of December, 1908, the jury returned their verdict finding the defendant guilty of manslaughter in the first degree and requesting the court to assess the punishment. He was sentenced to confinement in the penitentiary at hard labor for a term of 10 years.

A substantial statement of the essential facts in the case, as shown by the testimony, is as follows:

Mrs. Dennis Lawson, widow of the deceased, testified: That she was married to the deceased about two years, and lived at Mill Creek. That her husband was about 35 years of age, 6 feet and 1 inch high, and weighed about 250 pounds. That she knew the defendant. That on the day before the homicide she was at Ardmore visiting her mother-in-law, Mrs. Lawson. That her hus-

band and the defendant called there about 3 o'clock p. m. That they stayed there long enough for her husband to feed and water his horse. That they then left together. That the next morning some one telephoned that her husband had been shot, and she went to Mulkey, arriving there about 8 o'clock. That she found her husband perfectly rational. That she and Mr. Thompson searched his clothing and in the right-hand pocket of his trousers they found his knife. She was then asked:

"Q. State whether or not he had any weapon of any kind when he left. A. He did not—but the knife. Q. Did he own any pistol? A. He did not. He has not since we have been married. The Court: What is that last answer? A. He hasn't since we have been married."

She further testified that her husband died about 4 o'clock that afternoon; that was December 4, 1908.

Dr. J. E. Booth testified: That he was a practicing physician, resided at Mulkey, and his house was about 100 yards from the home of the defendant. That on the morning of December 4th about half past 1 o'clock B. F. Lambert and Walter Brown called and asked him to go over to John Mulkey's. That he immediately went over and met defendant, and he said: "Go ahead, Dr. Booth, and do all you can for him." That Jim Mulkey got there about the same time. That he found Dennis Lawson lying three or four feet north of the southwest corner of the house. That Lawson said: "O! My God! I am killed." That Jim Mulkey, Lambert, Walter Brown, and Cliff Thompson placed him on a cot and carried him to his house. That he gave him medicine and sent for Dr. Hardy. That when he arrived they dressed the wound. That the deceased had a gunshot wound in his body about an inch to the left of the navel. That the deceased said that he was dying and wanted a notary to give a statement. That he sent for T. R. Thompson, a justice of the peace. That when T. R. Thompson arrived the deceased made a statement, and Thompson wrote it down, and the deceased signed it. That about an hour after the shooting the defendant came to the house. Witness was then asked:

"Q. Did you hear anything said by the deceased to the defendant? A. Yes, sir. Q. And by the defendant to the deceased at that time? A. Yes, sir. Q. Tell the jury what it was. A. John walked in there, and Dennis turned—John walked in to the cot, and Dennis says, 'John, you have murdered me,' and John says, 'Well, you made me do it.' Dennis says, 'No, I didn't.' John says, 'Yes, you did.' And then I says, 'Jim, let's get John out of there.' So I walked in and John went out of the room."

On redirect examination he further testified as follows:

"Q. Doctor, I want to get the exact language that Dennis Lawson used when you first went up to him, the first thing he said, the exact language. A. He said, 'Everett'; he says, 'Everett, I am dying,' or he called me 'Doctor,' I don't know which—I don't know which, for sure. Q. Didn't he say, 'He murdered me, Doctor'? A. He said that some time during the talk, before I went for Thompson."

Dr. Walter Hardy testified: That he was a practicing physician at Ardmore. That he was called by phone and went out to Mulkey to see Dennis Lawson. He found him at the residence of Dr. Booth. That he was suffering from a gunshot wound in the breast about four inches below the breast bone, two inches to the left of the median line and about two inches above the navel. That it was necessarily a fatal wound.

T. R. Thompson testified that he was a justice of the peace in and for Wilson township, Carter county; that on the morning of the 4th of December he was called to Dr. Booth's residence and there found Dennis Lawson; that he said that he knew that he was in a dying condition, and made a statement, and witness reduced it to writing, and Mr. Lawson signed it in the presence of the subscribing witnesses.

B. F. Lambert testified that he was a tenant on the Mulkey farm; that he and the deceased had been friends for about 12 years; that he was in Ardmore on December 3d, and, while returning home with W. H. Hunter, John Mulkey and Dennis Lawson passed them on the road, and stopped, and Mr. Lawson gave them each a drink of whisky; that about 8 o'clock that evening he called at Mr. Mulkey's house and found Mr. Mulkey, Mr. Lawson and Mr. Brown there; that about 10 o'clock they all took a drink

of whisky, and Mr. Lawson suggested a crap game, and produced a couple of dice out of the pocket; that Mr. Lawson and Mr. Mulkey engaged in a crap game; that one pint of whisky and part of another was drunk during the game.

The witness then testified as follows:

"Q. Who was it doing the drinking? A. I drank a little bit of it. Mr. Brown drank some. The principal drinking, however, was by Mr. Mulkey and Mr. Lawson. Q. You say the game progressed until something after 1 o'clock. A. Yes, sir. Q. What happened at that time, Mr. Lambert? A. Why, then the dispute came up over the dice. Q. How did that dispute arise? A. Mr. Lawson throwed the dice and called it something, I don't know what, for I don't know what dice play is, and Mr. Mulkey said it wasn't that. Well, the dispute began then over this game. They differed in what it called. And Mr. Mulkey, he said to Mr. Brown, he says, 'How was it?' Well, he sanctioned what Mr. Mulkey had said in what the game called. Mr. Lawson said, 'Ben, what was it?' I said, 'Dennis, I don't know what it was, only there was three spots on that dice I saw.' Well, at that time he sprang to his feet, jerked out his knife, and he says, 'No three God damn men can run over me.' 'Now,' says I, 'Dennis, I wouldn't do anything like that as long as we been together and been friends in every way in the world, I wouldn't do anything like wrong against you—you oughtn't to do that.' 'No,' he says, 'Ben, I oughtn't to have said it.' Q. What did he do then? A. Mr. Mulkey and Mr. Brown, they had stepped back into the west room. I said, 'Mr. Lawson,' I said, 'Dennis, put on your coat; let's go over home with me.' 'All right,' he says, 'we will,' and put on his coat. About that time the two, Mr. Mulkey and Mr. Brown, re-entered the west—the east room. Mr. Lawson says: 'You have went away, God damn you. You have went away and loaded yourself for me, have you?' Mr. Mulkey says, 'No, Dennis, I have not,' and he throwed off his coat—he had only his dress coat on—and throwed up his arms, and says: 'Examine me. I wouldn't go and load myself for you.' Mr. Lawson says, 'Where is my money?' John says, 'I won it.' 'Well, then, sit down and let's play out this game.' 'No,' Mr. Mulkey says, 'there is a racket in here. I am afraid it will enter into trouble, and let's quit.' 'Well, God damn you, I want my money.' 'Now, Dennis,' Mr. Mulkey says, 'you know we have played together a heap, and what you won you wanted, what I won I wanted, didn't I?' 'Well,'

he says, 'you can God damn sure get it.' There was only $10 on the board, in sight. The rest that they played for was for checks. He says, 'Give me your checkbook.' Mr. Mulkey says, 'I care nothing about the check.' He says, 'God damn you, give me back my $4.75 then.' That's what money he had put on the board. John repeated that, 'I won it.' 'Well, give me your checkbook, then.' 'No, I care nothing about the check,' Mr. Mulkey says, 'I care nothing about the check.' 'God damn you, what you won you wanted and you can damn sure get it.' Mr. Mulkey gave him his checkbook, and he wrote the check. Now, some language was used here, if it can be avoided in the presence of ladies, I would like to modify it. Mr. Cruce: Well, omit that, or else have the ladies withdrawn. Mr. Matson: It doesn't make any difference to me. Go ahead and tell it without stating the language. * * * A. (Continuing) When Mr. Lawson got the check written, he handed it to Mr. Mulkey, and he says, 'Take it and stick it in your God damn —————— and go straight to hell, God damn you.' Mr. Brown says, 'You don't think he would have to go there to cash it, do you, Mr. Lawson?' I believe that was spoken in a manner to make it justifiable and pass it off— Mr. Matson: I object to that. Never mind. Just tell what was said. A. He said, 'You don't think he would have to go there to cash it, do you?' and Mr. Lawson made no reply to that. 'Now,' he says, 'John, if you were in my house, as I am in your house, I would turn you back this money and the check.' John repeated again: What he won he wanted it. That had been always their custom. 'Well,' he says, 'sit down and let's play this game out.' 'No, I don't want to play more now.' He says, 'If you don't give me back my money, or sit down and play this game out with me,' he says, 'you are a God damn son of a bitch.' John says: 'Don't say that, Dennis. Don't talk to me that way. Now, don't talk to me that way, I can't stand it.' 'Well,' he says, 'John, I oughtn't to have said that. Your mother was a nice woman as there is in the world; but, God damn your soul, if you don't sit down and play this game out or give me back my money, you just as well hold me up and rob me.' John repeated over again not to talk to him that way, 'Now, don't do it.' And about this time Mr. Brown stepped up to Mr. Lawson and takes hold of him, he says, 'Dennis, let's go out,' or 'Mr. Lawson,' I think was the words he used, 'let's go out,' and with a kind of push, kind of persuading him, 'let's go out,' they began to move towards the door, Mr. Lawson going forwards, and at that time he jerked his knife out of his pocket

5 Cr.—6

and throwed—caught it in his left hand and throwed his right hand behind him and said, 'I will kill the damned son of a bitch.' Mr. Mulkey or Mr. Brown, one, I don't know which, but it was said anyhow, 'You haven't got any gun, have you?' He says, I have, and a damn good one,' and at about those words they cleared the door going out at the south door of the east room. Almost immediately after that I entered the same door. Mr. Mulkey passed into the west room through the partition door, and he came out the south door of the west room with his gun, passed right across in front of me to the east end of the porth, and sat down on a barrel, and during this time Mr. Brown and Mr. Lawson were passing around down on the east end of the house in the direction of the— Q. Well, did you see that? A. I could hear them talking, and from the talk that was the direction they were going. I didn't see them. From the talk they were passing around the east end of the house, down towards the northeast corner of the yard, and pretty soon Mr. Brown came back, the same direction that he went away, alone. He says, 'John, come on back in the house.' He says, 'He has gone down through the field.' And it occurred to me as that was right in the direction of my house— Q. Never mind. Just tell what you did. A. Well, I jumped back in the house to get my coat to catch up with him, as he was going down that way, that we would go on home. And just as I came back in the door, at the same door I went out at and I turned to the east end of the room to get my coat as it lay on the cot sitting there, picked it up, and just about had one sleeve on when I heard some kind of noise in front of me, words, I thought, of some kind—I don't know what was said—that attracted my attention, and I saw the bulk of a man pass the window going towards the south, and, it being only a 14-foot room, taking out 2 feet for the window, would make it pretty close to the corner, and almost as quick as I could think the gun fired, and the hollering began right at that corner, and the hollering passed around the house, the east end and north side, and on back around to the southwest corner of the house, and there stopped."

Witness further testified as follows:

"Q. After that shot was fired, what happened then. A. I started out—I had the coat half on, I threw that off as I started towards the door, and as I struck the door Mr. Mulkey struck the door from the outside, just a little first, as he pushed the shutter back that threw me back behind it a little, and he came in then, throwed his gun down, and fell right down on the floor

and said, 'My God!' and about the time he repeated these words I passed out at the same door and went to Mr. Lawson, where he was hollering. Q. Who got to Mr. Lawson first? A. I got there first. Q. What occurred when you got to him? A. He says: 'Ben, turn me over. I am murdered.' Q. What did you do? A. I turned him over. Q. Where did you find him? A. I found him near the southwest corner of the house. Q. What did you do then? A. He says, 'Get me the doctor quick.' Then I ran for the doctor and told the doctor what was done. Q. What doctor did you get? A. Dr. Booth."

These were the only witnesses called by the state.

The theory of the prosecution is that it was a deliberate, wanton murder. The theory of the defense, justifiable homicide in self-defense.

As a witness for the defendant, B. W. Brown testified as to the happenings at the home of the defendant, and as to the circumstances immediately attendant upon the shooting. His testimony was in substance the same as that of the state witness Lambert.

The defense introduced some nine or ten witnesses, including two members of the Legislature and the sheriff of Carter county, who testified that they were well acquainted with the defendant for different periods of time ranging from 4 to 15 years and were well acquainted with the people who resided in the community where defendant lived, and that they were acquainted with the general reputation of the defendant in that community for being a peaceable, law-abiding man, and that his reputation was good.

The defendant testified on his own behalf, and, as to the circumstances immediately attendant upon the killing, stated them in effect as the state witness Lambert and the witness Brown had testified. He further testified that he was 36 years old and had lived in what is now Oklahoma for about 20 years, that he had known the deceased about 10 years, and their relations had always been friendly. He further testified that:

"When deceased was leaving the house, he said, 'I am going to kill that damn little son of a bitch,' and that Mr. Brown says, 'You have not got any gun have you?' Deceased said 'Yes, I

have, and a damned good one.' And I noticed he put his hand back there (indicating his hip pocket.)"

He further testified: That he was afraid to stay in the house, the lights were lit, and that the curtains could not be pulled down. That he took a shotgun and went out and sat down on a barrel on the porch. That the deceased came around the house and saw him sitting on the barrel and said, "Oh, yes," and ran his hands in his pocket like that (indicating), and that he shot because he was afraid that deceased would kill him. He further testified that he knew the deceased was a desperate man when he was drinking, and that he had seen him have trouble, and that he had heard of several other cases of trouble where he got his knife out and also his gun, after first one and then the other. The record further shows his examination as follows:

"Q. Did you know anything about Dennis Lawson's habit with reference to carrying a pistol? A. Yes, sir. Mr. Matson: I object to that, your honor, unless it is confined to the time of this killing; that he knew of it. The Court: Well, I suppose the question has reference to that. Mr. Cruce: Yes, it has reference to his habits as to carrying a pistol prior to the homicide—to his knowledge of it. The Court: How long prior to the homicide, Mr. Cruce? Mr. Cruce: Well, then, within any time within two years? The Court: Objection sustained, if that is the limit. (To the ruling and action of the Court the defendant at the time excepted.) Q. Do you know anything about the habit of Mr. Lawson with reference to carrying pistols for a year prior to the homicide? Mr. Matson: I object. The Court: Objection sustained. (To the ruling and action of the court the defendant at the time excepted.) Mr. Cruce: The court will let us put in the record what we expect to prove? The Court: I expect you could prove what your question imports? Mr. Cruce: Yes, sir. The Court: A year or two years previous? Mr. Cruce: Yes, sir."

The defense also introduced some eight or nine witnesses, who testified that they were acquainted with the deceased during his lifetime for different periods of time ranging from 5 to 10 years, and that they were acquainted with his general reputation in that community for being a desperate and dangerous man when under the influence of liquor, and that his reputation in this respect was

bad. On cross-examination each of these witnesses testified that deceased's general reputation for peace and quiet in that community when sober was good. The defense then offered to prove by four witnesses specific instances of assaults made by deceased with a dangerous weapon in the community where he lived. The court refused to permit said evidence to be introduced as incompetent, and allowed an exception.

On January 2, 1909, the court pronounced judgment, and sentenced defendant to be confined in the state penitentiary at hard labor for a period of 10 years, from which judgment and sentence an appeal was taken by filing in this court on April 20, 1909, a petition in error with case-made attached.

Cruce, Cruce & Bleakmore, R. F. Turner, and J. B. Champion,, for plaintiff in error.—On admissibility of dying declarations: Bateson v. State, 46. Tex. Cr. R. 34; Medina v. State, 43 Tex. Cr. R. 52; Wharton, Crim. Ev., sec. 278; 4 Elliott, Ev., sec. 3033; Clark, Crim. Proc., sec. 210. On improper argument of prosecuting attorney: Buck v. Territory, 1 Okla. Cr. 517; Bilton v. Territory, Id., 566; Cannon v. Territory, Id. 600. On admissibility of previous specific acts of violence on part of deceased: Clark's Crim. Proc., sec. 218; Riley v. Com. (Ky.) 22 S. W. 222; Boyle v. State, 97 Ind. 322; 1 Wigmore, Ev., secs. 63, ·198, 246; State v. Baird (Iowa) 92 N. W. 694; Bowles v. State (Ind.) 28 N. E. 1115; Smith v. U. S., 161 U. S. 85. On proper instructions on justifiable·homicide: Price v. State, 1 Okla. Cr. 358.

Charles West, Atty. Gen., and Smith C. Matson, Asst. Atty. Gen., for the State.—On admissibility of dying declarations: Sullivan v. State, 102 Ala. 135; Gerald v. State, 128 Ala. 6; Powers v. State, 74 Miss. 777; White v. State, 100 Ga. 659; State v. Mace, 118 N. C. 1244; State v. Lee, 58 S. C. 335; State v. Kessler, 15 Utah, 142; State v. Giles, 8 Wash. 12. On Admissibility of specific acts of violence on part of deceased: Thomas v. People, 67 N. Y. 222; State v. Mims, 36 Ore. 315; Sanford v. State, 143 Ala. 781; Campbell v. State, 38 Ark. 498; People v. Griner, 124 Cal. 19; Fahnestock v. State, 23 Ind. 231; Logsdon v. Com., 11

Ky. L. 550; *Jenkins v. State,* 80 Md. 72; *State v. Ronk,* 91 Minn. 419; *King v. State,* 65 Minn. 576; *State v. Jones,* 134 Mo. 254; *State v. Ussery,* 118 N. C. 1177; *Alexander v. Com.,* 105 Pa. 1; *Gibson v. State* (Tex. Cr. R.) 68 S. W. 174; *Pound v. State,* 43 Ga. 88.

.DOYLE, JUDGE (after stating the facts as above.)   The petition in error is voluminous, covering 30 printed pages, and alleges 43 assignments of error,   Whether the homicide was murder, manslaughter in the first degree, or justifiable in self-defense is, in our view of the record, a very close question.   The jury by their verdict said it was manslaughter in the first degree, and their determination would not be disturbed without error of law. But the fact that the question of guilt is so close makes it very important that the trial should be free from error of law.   Upon a careful examination of the record, the conclusion of the court is that, for error of law occurring at the trial, the judgment in this case must be reversed, and a new trial granted.   We will consider only those assignments of error which upon another trial will be liable to again arise.

The first assignment is that:

"The court erred in the admission of the following testimony: Dr. Everett Booth, witness for the state, was asked the following questions: Doctor, I want to get the exact language that Dennis Lawson used when you first went up there, the first thing he said, the exact language.   A. He said, 'Everett, I am dying,' or he called me 'Doctor,' I don't know which—I don't know which, for sure.   Q. Didn't he say, 'He murdered me, Doctor'?   A. He said that some time during the talk before I went for Thompson."

This question was objected to because it was leading and calls for the conclusion of the deceased.   The record shows that the statement was made to the first person that he spoke to after he was shot.   It was therefore clearly admissible as a part of the *res gestae.*   But the form of the question is objectionable as being leading and suggestive, and for this reason the objection should have been sustained.

The second assignment is that: "The court erred in permitting to be read to the jury certain clauses in the written dying statement of deceased, Dennis Lawson." Said dying statement is in words and figures as follows:

"Mulkey, Oklahoma, December 4, 1908. I, Dennis Lawson, in my right mind without any malice or hatred in my heart, wish to make this statement in regard to John C. Mulkey shooting me. I was stopping at Mr. Mulkey's house to spend the night, expecting to buy some cattle from Jim Mulkey next morning. I and John Mulkey, and B. F. Lambert and some boy I didn't know was standing up in John Mulkey's house talking and playing dice. John was drinking some and claimed a little stake we had up and got mad and called me some very ugly names, and I got up and went out doors to avoid having any trouble. The young man went out with me, and after a few minutes I turned and walked back around the house not suspecting anything, but just as I went to turn the corner of the house John Mulkey shot me without warning, foully murdered me without warning. I make this statement believing that I cannot live long and only wish to make such statement in justice to myself and family and the good people at large. [Signed] D. Lawson. Signed in my presence and in the presence of D. W. Dunn, W. H. Hunter, Dr. Booth. T. R. Thompson, J. P."

Defendant's counsel before the reading of this statement objected to the clause, "without any malice or hatred in my heart," occurring in the first sentence; and also to the clause, "to avoid having any trouble," occurring in the sentence, "I got up and went out doors to avoid having any trouble"; also to the statement, "John Mulkey shot me without warning, foully murdered me, without warning"; also to the concluding words, "and only wish to make such statement in justice to myself and family and the good people at large.' The court struck out the words from the dying declaration ."foully murdered me," and permitted the statement to be read as made with these three words stricken out. It is contended that the clauses and words objected to were mere expressions of opinion and conclusions of the defendant, and the motion to strike out the same should have been sustained.

Dying declarations are statements of material facts concern-

ing the cause and circumstances of the homicide, made by the victim, under the solemn conviction of impending death, and as such are to be distinguished from other admissible declarations, such as declarations which constitute a part of the *res gestae*, or declarations made in the presence of the accused. Such declarations are admissible as evidence against the accused because they were admissible at common law. The constitutionality of this rule has been so uniformly affirmed that the question is no longer an open one. They may be oral or in writing; being a substitute for sworn testimony, they must be such narrative statements as would be admissible had the victim been sworn as a witness. Mere conclusions or matters of opinion or belief, which would not be received if the declarant was a witness, are inadmissible, and, upon objection properly made, such statements or clauses should be rejected. In the absence of a statute, the rule requiring a dying declaration to go in as a whole has no application here.

The rule that dying declarations should be confined to facts concerning the cause and circumstances of the homicide is one that should not be relaxed. It must be remembered that this kind of testimony is classed as hearsay evidence and is admitted under an exception to the general rule from considerations of public necessity. It is not under the sanction of an oath, and there is no opportunity for cross-examination. It overrides the sacred constitutional right of an accused to be confronted with the witness against him. It is also subject to the special objection that such declarations are usually made when the declarant is in the last stage of physical exhaustion, with mental powers impaired to a greater or less extent. It leaves entirely out of consideration the fact that passions and prejudices, which in life pervert the perceptive faculties, do not always lose their power on the deathbed. Such evidence is also liable to be incomplete. The victim may naturally be disposed to give only a partial account of the occurrence, although possibly not influenced by animosity or ill will. All these objections are overcome by the one consideration of public necessity that society may not be deprived of the testimony, such

as it is, and whatever it may be worth. In Wharton's Criminal Evidence (9th Ed.) par. 294, the rule is thus stated:

"Nothing can be evidence in a declaration *in articulo mortis* that would not be so if the party were sworn. On this rule, anything the murdered person, *in articulo mortis,* says as to the facts, is receivable, but not what he says as matter of opinion or belief. Hence the declaration,'It was B. W. who shot me, though I did not see him,' is inadmissible. But where, in making a dying declaration, the declarant, in speaking of the fatal wound, said it was done without any provocation on his part, it has been held that this declaration is not incompetent it relating to fact, not opinion."

Under the rule here stated, the first clause objected to is of doubtful admissibility, but was presumably admitted upon the theory that if sworn as a witness it would be competent as to the state of his feelings toward the defendant. The second clause is a statement of fact, and the objection was properly overruled. The objection to the third clause was properly overruled, as to the words, "John Mulkey shot me without warning," but should have been sustained to the extent of including the words "foully murdered me without warning." Similar statements were properly admitted as a part of the *res gestae,* also as made in the presence of the defendant. The objection to the fourth and concluding clause should have been sustained.

The following cases support the rule: In the case of *Bateson v. State,* 46 Tex. Cr. R. 34, 80 S. W. 88, Henderson, Judge, used the following language:

"We do not believe it was competent for the state to prove, as was done, by one witness, that deceased told him to tell his wife 'good-bye'; and by another witness, 'They murdered me without cause.' As to the first statement, it does not appear to have been an issue as to whether deceased at the time he made this dying declaration was not conscious of approaching death. This appears to have been taken for granted. At any rate, this was a matter for the court and not for the jury in passing on the admissibility of the testimony. A witness can only state matter involved in a dying declaration, to which deceased could testify if alive and a

witness on the stand, and could not give in evidence matters of opinion."

In *Sullivan v. State,* 102 Ala. 135, 15 South. 264, 48 Am. St. Rep. 22, Brickell, C. J., delivering the opinion of the court, said:

"Just before Emerson, the deceased, expired, when he was conscious he was dying and so expressed himself, he made two declarations which were offered in evidence as dying declarations. Each was separately objected to, each objection was overruled, the testimony was admitted, and a separate exception was reserved to each ruling. One of the declarations was: 'Jim Sullivan cut me. He cut me for nothing. I never did anything to him.' The objections made to this testimony were that it was the conclusion of the declarant—the opinion of the deceased—and that it did not relate to the circumstances or transaction of the killing. There is nothing in this objection. The statement certainly did relate to the act or transaction of the killing. The killing was effected by means of an incised wound. All the witnesses concur in that. He also said Sullivan cut him for nothing, and that he, the declarant, did nothing to Sullivan. True, this statement was very general, but it was admissible as a collective fact. The other part of the declaration was simply a continuation of the former: 'I pray God to forgive him.' This should have been excluded. It did not in any way relate to or shed any light on the act of killing, or that which apparently led to it."

See, also *Medina v. State,* 43 Tex. Cr. R. 52, 63 S. W. 331; *State v. Clemons,* 51 Iowa, 274, 1 N. W. 546; *Binns v. State,* 46 Ind. 311; *Whitley v. State,* 38 Ga. 50; *State v. Williams,* 67 N. C. 12; *People v. Shaw,* 63 N. Y. 36; *Collins v. Com.,* 12 Bush (Ky.) 271; *Shenkenberger v. State,* 154 Ind. 630, 57 N. E. 519.

The third, fourth, and fifth assignments question the action of the court admitting, over defendant's objection, testimony showing that the defendant had whisky at his house. These assignments are without merit.

The sixth assignment is that the court erred in refusing to permit the defendant to testify that he knew the deceased's habit with reference to carrying a pistol. Objection was made by the

state that he could not so testify unless his knowledge of the de-
ceased's habit was confined to the time of the homicide.    Defend-
ant offered to prove by himself that this habit of the deceased
had existed for two years.    An objection was sustained, and ex-
ception taken.    He then offered to prove that such habit had ex-
isted for one year prior to the killing.    An objection was sustained
and exception taken.    We believe that this evidence was relevant
and admissible, and that the court committed serious error in
sustaining the objections.    Evidence had been introduced showing
that the conduct and behavior of the deceased in the home of the
defendant was abusive and quarrelsome; this in connection with
the assault made with a knife, and the threats made by deceased that
he would kill the defendant, and his declaration that he had a
gun, and the fact that his conduct was such that those present in
order to protect the defendant persuaded the deceased to leave the
place, and defendant having testified that, from what had oc-
curred and the threatening words of deceased, he was afraid to
stay in the house, and for this reason he took the shotgun and
went out on the porch, that the deceased returning to the house,
and, seeing the defendant, ran his hands in his pocket, and defend-
ant fired the fatal shot, also the further fact that the prosecution
was allowed to show by the evidence of the widow of the de-
ceased that he had no pistol that day, and that he was not the
owner of a pistol for two years prior thereto.    In view of this fact,
and the evidence tending to show that the defendant acted in self-
defense, we think the evidence was clearly competent.

It is a general rule that, in cases in which a *prima facie* case
of self-defense is made out, evidence of any facts or circumstances
likely to show the condition of the defendant's mind as to the
necessity of self-defense is admissible.

In *Riley v. Com.*, 94 Ky. 266, 22 S. W. 222, it was said:

"The defendant complains also because he was not allowed
to show the well-known habit of deceased as to carrying a pistol
just prior to the shooting, and that his reputation was that of a
violent man, with an ugly temper.    On the authority *Payne v.*

*Com.*, 1 Metc. (Ky.) 379, we think this testimony was admissible. The deceased had used threatening language towards the defendant, of which he had been informed, and there was proof tending to show that he had in anger sought him and the commonwealth was allowed to show that he had no pistol on his person at the time of the fatal encounter. In view of all the facts in this case, we think it was competent to show that the deceased was a man of violent temper, and was in the habit of carrying concealed weapons just prior to the shooting."

In the case of *Horbach v. State,* 43 Tex. 242, Roberts, C. J., used the following language:

"There was evidence tending to prove one of two conclusions leading to different results, either that Horbach shot Thomas from a sudden motive of revenge for an unprovoked and gross insult, or under the belief that the gross insult was then being followed up by the act of making a deadly assault upon him with a weapon, endangering his life. The facts tending to the establishment of the latter conclusion (to what extent, it is immaterial to consider now) were that Thomas, having a dispute with the barkeeper about his liquor bill, became angry, and, without any apparent cause, turned the controversy about it from the barkeeper to Horbach. The barkeeper, Shock, and Horbach, all tried to pacify him, and let him have his own version of the matter. Still he persisted in fastening the controversy on Horbach, who was not concerned in it and was not even present when it commenced. Horbach treated the matter lightly at first, and, when all the means that were tried could not divert him from making the issue with Horbach, he commenced treating the matter seriously, and asked Thomas what he meant. Thomas stepped back his right foot, and threw his hand behind him as if to draw a pistol. It may be a significant fact, as tending to show the known character of Thomas, that the persons there, seeing the matter becoming serious, did not interfere, except that Shock, having been once rudely repulsed by Thomas, stood off at some distance shaking his head at Horbach. This may bear two constructions, either that they did not think it necessary to interfere, or that they did not think it consistent with their own safety to interfere with Thomas any further than had been done. For the purpose of adding still further weight to the evidence, tending to the conclusion that Horbach acted under the belief, and had reasonable grounds, from the words and acts of Thomas then said

and done, to believe, that Thomas was in the act of making a deadly assault upon him with a weapon, the defendant, by his counsel, sought to prove by questions to witness that Thomas was in the habit of carrying deadly weapons, and that Thomas, when intoxicated, was a quarrelsome and dangerous man. The questions, being objected to, were not allowed to be answered, to which rulings of the court defendant excepted, which appears in bills of exceptions in the record. The question is: Was such evidence admissible for such a purpose as an element of defense?

" 'Evidence, in legal acceptation, includes all the means by which an alleged matter of fact, the truth of which is submitted to investigation, is established or disproved. By competent evidence is meant that which the very nature of the thing to be proved requires as the fit and appropriate proof in the particular case.' The thing sought to be proved in this case is that Horbach had reasonable grounds to believe, and did believe that Thomas then intended and was in the act of then attempting to kill him, by the use of a weapon. Now, supposing it to be proved that Thomas, being enraged and pressing the unprovoked quarrel upon Horbach until it became serious, and had arrived at a point where Thomas would either have to recede or follow it up with increased malignity, and just at that juncture he steps back and throws his right hand behind him, what other facts would be required as peculiarly fit and proper to be known by Horbach to induce that reasonable belief? Certainly the most fit and appropriate additional facts that he could possibly know, tending to prove such reasonable belief, would be that Thomas had a pistol on his person back where he put his hand, and that he was a man that would use it when mad and intoxicated, and would not likely back down from a difficulty that he had himself provoked. If Thomas was in the habit of carrying a pistol where he put his hand, it was not improbable that his friend Horbach, as well as others, knew it, and might infer from the motion of his hand the intention to draw it; and, if his general character was that of a dangerous man when aroused with anger and excited with drink, Horbach might infer that Thomas intended to use the pistol on him when drawn. On the other hand, if Horbach knew that Thomas' general character was that of a quarrelsome man, with no force of character, not vicious and destructive in his nature, not likely to use weapons if he had them, and not in the

habit of carrying them, then the inference might not be reasonable from his conduct that. he intended then to draw and use a pistol.

"Thus is it shown that these very facts, Thomas' character for violence and habit of carrying arms, with Horbach's knowledge of them, might determine his guilt or innocence in acting as promptly as he did. His intoxication, his anger, his persistently pressing the difficulty on Horbach without cause, his violent character, and his habit of carrying weapons, would all be appropriate and fit facts, if they existed, to throw light upon and give significance to his movement in stepping back and throwing back his hand. Taken separately and in the abstract, they may be meaningless, indifferent, and immaterial; but, taken together, they may be pregnant with meaning, as shown by the conduct of the two witnesses, Wilson and Shock, who saw Thomas' motion of his body and of his hand. A man's character for violence, dependent upon his irascible temper, overbearing disposition, and reckless disregard of human life, is as much a part of himself as his judgment and discretion, his sight or hearing, his strength, his size, his activity, or his age, any one of which may become a material fact to give a correct understanding of his conduct and the intention with which an act is done by him, and are therefore part of the *res gestae* when pertinent to the act sought to be explained. Their office in evidence is adjective, as auxiliary to a substantive fact to which they are pertinent, and without which they are irrelevant and immaterial. They are helps to the understanding in construing human conduct. The mind cannot reject or disregard them. They, and all like helps, ever have been, and ever will be elements in the formation of belief as to what a man designs by an act to which they are pertinent. Practically we know that men generally, who are assailed with violence, act in defending themselves with promptness and force in proportion to the violent and desperate character of their assailant. It behooves them so to do for their own safety, because it is known that such men who usually fight only with weapons, and usually have them ready for use, are not to be trusted to get an advantage in the combat.

"If, then, the character of the assailant in any case has helped to form a reasonable belief in the mind of the assailed that his life was then in danger, when the acts alone would fail to do it, the jury should in some way be informed of the character of the assailant, as well as of his acts, to enable them to understand that

the belief was a reasonable one. Otherwise he might act in his defense on such reasonable belief, and the jury, not helped by any knowledge of the assailant's character to understand the import of his acts, of which they were informed, would find him guilty of murder, because of his having acted without reasonable grounds for believing that his life was then in danger, when in fact he had such reasonable grounds of belief, did believe it, and acted on such belief. This being sometimes an important fact, necessary to be known by a jury to enable them to come to a proper conclusion as to the state of mind of the accused just at the time when he killed the deceased, how and under what circumstances is it admissible in evidence? It is laid down as the rule at common law, as practiced in England and most of the older states of the American Union, that it must be made to appear, if at all, in the transactions immediately connected with the killing as a part of the *res gestae,* as it is termed, and to be deduced therefrom rather than to be proved as a distinct fact."

And continuing said:

"In the case of the proof of general character of the deceased, there must be a predicate established by evidence already submitted, tending to prove threats of the deceased, or some act done by him at the time of the killing, which it would aid or give force to, as heretofore explained; and, when admitted, it would be proper, and not charging on the weight of evidence, for the court to explain to the jury the object of its admission as auxiliary and explanatory of the threats or acts to which it was pertinent, and to be not of itself independent evidence of a defense. The evidence exhibiting the acts of the deceased at the time of the killing constituted a predicate for the admission of the proof of the general character of the deceased as a violent and dangerous man, and that he was in the habit of carrying weapons, and upon the ground such proof should have been admitted."

In the case of *State v. Keene,* 50 Mo. 358, the court said:

"Where homicide is committed under such circumstances that it is doubtful whether the act was committed maliciously, or from a well-grounded apprehension of danger, it is very proper that the jury should consider the fact that the deceased was turbulent, violent, and desperate, in determining whether the accused had reasonable cause to apprehend great personal injury to himself."

This was said in reversing a conviction for murder, because the court had excluded evidence offered that the deceased was a

quarrelsome, dangerous, and desperate man, and in the habit of carrying weapons.

In *Cawley v. State,* 133 Ala. 128, 32 South. 227; *Naugher v. State,* 116 Ala. 463, 23 South. 26, and *Wiley v. State,* 99 Ala. 146, 13 South. 424, it was held that it was error not to allow the defendant to testify, as tending to support his plea of self-defense, that the deceased was in the habit of carrying a pistol, which fact was known to him.

The seventh to the thirteenth, inclusive, assignments of error refer to the action of the trial court in refusing the defendant permission to prove specific acts of violence and misconduct on the part of the deceased, for the purpose of showing his actual lawless disposition, and as evidencing the deceased's probable aggression. We deem it unnecessary to burden this opinion with each specific offer of proof, and will only refer to one. The defendant offered to prove by the witness L. Larson that, a short time prior to the death of Dennis Lawson, the witness asked him for an account he owed, whereupon the deceased became furious, drew his knife upon witness, and, if witness had not thrown his pistol in deceased's face, deceased would have killed him. That, subsequent to this event, the deceased came to the witness, and, while talking to him in a friendly way about the account, suddenly attempted to draw a pistol, but was prevented by the witnesses Stallcup and Fatheree. The court seems to have excluded this testimony on the theory that it was an attempt to prove the character of the deceased by these specific acts. As a general rule, the evidence of the character of the deceased must be confined to his general reputation, and evidence of particular acts of violence is inadmissible unless they were directly connected with that involved in the homicide. Usually testimony of this character would have but little bearing upon the case, and the general reputation of the deceased as being a desperate and dangerous man would be sufficient. But, under the facts which the evidence here tends to prove, these prior assaults and acts of violence, being known to the defendant, were important circumstances in determining from the standpoint of the defendant the reasonableness

of the danger apprehended by him, and for this reason it was error to exclude this testimony.

Prof. Wigmore says:

"When the issue of self-defense is made in a trial for homicide, and thus a controversy arises whether the deceased was the aggressor, one's persuasion will be more or less affected by the character of the deceased; it may throw much light on the probabilities of the deceased's action." (1 Wigmore on Evidence, § 63.)

"When the turbulent character of the deceased, in a prosecution for homicide, is relevant, there is no substantial reason against evidencing the character of particular instances of violent or quarrelsome conduct. Such instances may be very significant; their number can be controlled by the trial court's discretion; and the prohibitory considerations applicable to an accused's character have here little or no force." (1 Wigmore on Evidence, § 198.)

In the case of *Sneed v. Territory of Oklahoma,* 16 Okla. 641, 86 Pac. 70, Justice Pancoast, delivering the opinion of the court, said:

"The general rule is well settled by a long line of decisions that neither in criminal nor civil cases can the character or reputation of a person be proven by specific acts; but this is only the general rule, and, if the offer of evidence under consideration here can be classed as an attempt to prove character or reputation by specific acts, then it falls within an exception to the general rule; but we think that, while the evidence sought to be introduced may tend to show the character of the deceased, yet the purpose of its introduction and the reason for its admissibility was that it showed knowledge in the defendant of the violent temper of the deceased, and his disposition to use his gun on small provocation, also his condition of mind when affected by the use of liquor, or when in a condition of intoxication, and this violent temper, condition of mind, and disposition to use a gun upon small provocation was information to the defendant, brought home to him by reason of his personal observation of the deceased and his acts. The knowledge of the defendant, derived from such personal observation, as well as otherwise, of the violent temper of the deceased, and his liability to attack persons without cause, is a most important circumstance in determining from the standpoint of the accused the reasonableness of the danger apprehended by him,

5 Cr.—7

and from which the defendant might estimate the conduct of the deceased, the character of the attack made upon him, and what one might expect from his assailant, as well as that which he might at the moment deem necessary to guard himself against. Certainly the knowledge derived from this source of the acts of the deceased showing his disposition for violence and a depraved condition of mind would be as likely, or more likely, to affect the mind of the defendant than general information he might have obtained in common with the community that the deceased was a man of high temper and violent disposition when in a state of intoxication. *People v. Harris,* 95 Mich. 87, 54 N. W. 648; *Hurd v. People,* 25 Mich. 405-418; *People v. Lilly,* 38 Mich. 270; *State v. Testerman,* 68 Mo. 408. This testimony which was excluded was peculiarly important in this case, because of the fact that there was no eyewitness to the affray other than the defendant, and because the evidence showed that the defendant and the deceased were on friendly terms, were up to the very moment of the difficulty friends, and at the moment of the difficulty, without any provocation, either one or the other committed an uncalled for violent attack upon the other, which attack was of a character and under conditions not susceptible of explanation except upon the hypothesis that it was unprovoked. This being true, it was of the utmost importance that the jury should be allowed to hear evidence from which they could determine who provoked the attack, and the testimony excluded would certainly tend to throw some light upon the proposition, and its exclusion was reversible error."

See, also, *Poer v. State* (Tex. Cr. R.) 67 S. W. 500; *State v. Burton,* 63 Kan. 602, 66 Pac. 633; *Boyle v. State,* 97 Ind. 322; *Bowlus v. State,* 130 Ind. 227, 28 N. E. 1115; *State v. Beird,* 118 Iowa, 474, 92 N. W. 694.

The fourteenth and fifteenth assignments are based upon the conduct of the county attorney in his closing argument to the jury, as follows:

"I have seen the graveyard out yonder, and two of you gentlemen have also seen the grave, marked by a simple wooden slab. In that grave, moldering back to mother earth, is the body of a man shot down in cold blood, brutally assassinated on the streets of this city, while his slayer walked out of the courthouse with the blood of his victim .dripping from his fingers, a free man because he was defended by Mr. Cruce."

The defendant interposed an objection, for the reason, among others, that the same was prejudicial to the rights of the defendant. The county attorney, continuing, said:

"The verdict of this jury will live in the minds of our children and grandchildren, who will point to the record of this verdict in order to tell to the people of this county what this jury thinks of murder. If the plea of self-defense is to prevail in this case, I want to know it, so I may clear the docket of this court, and, O! My God! What is to become of the people of this county? If this is self-defense, I don't want to be your county attorney, and I want to know it, so that I may burn up the court docket, and the people had as well destroy the courthouse."

We are convinced that those statements went beyond the pale of legitimate argument and were prejudicial to the substantial rights of the defendant in this case.

As was said in *Vickers v. United States*, 1 Okla. Cr. 452, 98 Pac. 467:

"The probable effect of such appeals is to divert the attention of the jury from the evidence, prejudice them against the defendant, and prevent the exercise of sound dispassionate judgment upon the merits of the case. The approval of the trial court intensifies the effect of such prejudicial remarks, and subsequent instructions to disregard the remarks of counsel may not cure the injury already done."

In determining the effect of improper statements made by the prosecuting attorney in the closing argument to the jury, the strength of the testimony supporting the conviction will be considered, and, where improper statements may have determined a verdict, the judgment should be reversed.

Adopting the language of Judge Owen, in the case of *Cox v. Territory*, 2 Okla. Cr. 668, 104 Pac. 378:

"The county attorney in his closing argument to the jury made the statement that, if the evidence in this case did not bring about a conviction, he would quit prosecuting horse thieves in this county. We think this statement improper, and calculated to prejudice the minds of the jury against the defendant. It was the statement of an officer of the court, in the discharge of his duty, and was to the effect that, after his investigation of the case, he was so thoroughly convinced of the guilt of the defend-

ant that a failure to convict would be an outrage on justice, and that he, the sworn officer of the court, would feel so outraged that he would not prosecute any more horse thieves. We think this statement was calculated to influence the minds of the jurors and arouse their prejudice against the defendant. True, the court instructed the jury not to consider the statement, but in our opinion this did not sufficiently cure the evil; the attorney did not retract or withdraw the threat. Attorneys, on either side, in their arguments ought not to go out of the record, and they ought not throw into the scales with the evidence their personal and official opinion and desire as to what should be done. The prosecuting attorney in closing the argument should be confined to a reply to the legitimate argument on part of the defense and a fair discussion of matters in the record. The average juror holds in high regard, and properly so, the regularly elected prosecuting attorney. The people by electing him have reposed great confidence in his ability and integrity, and the power thus given him ought not be used to supply the lack of evidence, or to make greater the weight of the evidence, in any case. The authorities are numerous as to what constitutes improper conduct. They are uniform in holding any statement improper that is calculated to inflame the minds of the jurors, arouse their prejudice, or appeal to their passions."

The sixteenth to the twenty-third assignments, inclusive, are objections to the instructions given by the court, and the twenty-fourth to the forty-third assignments, inclusive, are exceptions to the action of the court in refusing to give instructions requested. It would be extending this opinion to a greater length than we have the time to do, should we undertake to review all these assignments, and it would serve no useful purpose to do so. The instructions given correctly state the law in the abstract. However, the contention that the phrase occurring in several instructions given that, "if the defendant was where he had a right to be," was prejudicial, is well taken. The defendant was at his own home, where he had a right to be, and an instruction to this effect should have been given. And, in view of the conclusions reached in this opinion, the defendant was entitled to have the following requested instructions given:

"You are instructed that every person has the lawful right to be and remain upon his own premises at any and all times.

"You are instructed that, if a person is assaulted in such a way as to induce in him a reasonable belief that he is in danger of losing his life or suffering great bodily harm, he will be justified in defending himself, although the danger is not real, but only apparent. Such person will not be held responsible criminally if he acts in self-defense from real and honest convictions as to the character of the danger, induced by reasonable appearances, although he may be mistaken as to the extent of the actual danger. A person need not be in actual imminent peril of his life or of great bodily harm before he may slay his assailant; it is sufficient if in good faith he has reason to believe from all the facts and circumstances, as they appeared to him at the time, that he is in such imminent peril.

"You are instructed that in determining whether or not the defendant, as a reasonable man, in good faith, believed at the time of the killing that he was in danger of suffering death or serious bodily injury at the hands of the deceased, you should take into consideration all the facts and circumstances that transpired at the house of the defendant just prior to and at the time of the killing, and also the defendant's knowledge of the deceased, and his reputation, as a violent and dangerous man.

"You are instructed that in determining whether or not, at the time the defendant fired the fatal shot, the deceased was committing some act of hostility toward the defendant, you should take into consideration the character of the deceased as a violent, dangerous man, or as a peaceable, law-abiding man, as you may believe such character to have been established from the testimony.

"You are instructed that every person has the right to act in his own necessary self-defense, and where a person is in a place where he has a right to be, and is not the aggressor in bringing on the conflict, and is assaulted by another person in such a way as to place him in danger of death or great bodily harm, the person thus assaulted is not bound to retreat, but, on the contrary, may stand his ground and repel the danger in which he is placed with such force as will repel the attack and protect his person from serious bodily harm."

For the reasons hereinbefore stated, the judgment of the district court of Carter county in said cause is hereby reversed, a new trial awarded, and the cause remanded.

FURMAN, PRESIDING JUDGE, and ARMSTRONG, JUDGE, concur.